```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/30/17
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPH CARTRIGHT, et al.,

                Plaintiffs

- against -

MATTHEW LODGE,

                Defendant.

15-CV-9939 (KMW) (RLE)

OPINION AND ORDER

KIMBA M. WOOD, District Judge:

I. INTRODUCTION

On December 21, 2015, Plaintiffs Joseph Cartright, Ruth Fowler, and Carolin Dekeyser (collectively, "Plaintiffs"), brought this action against Defendant Matthew Lodge ("Lodge"), alleging various tortious conduct under New York law. (Doc. No. 4, Complaint ("Compl.")). On March 1, 2016, the Clerk of the Court entered default against Lodge for his failure to appear in this action. (Doc. No. 15). The case was referred to Magistrate Judge Ellis for an inquest on liability and damages on April 18, 2016. (Doc. No. 18). An inquest hearing was held on July 7, 2016, and Plaintiffs filed a post-hearing brief and supplemental documentary evidence. (Doc. Nos. 27, 29, 32-39). The Court has withdrawn the reference to Magistrate Judge Ellis. For the reasons that follow, the Court GRANTS Plaintiffs' Motion for Default Judgment (Doc. Nos. 16, 17), and orders that judgment be entered for Plaintiffs in the amount of $1,234,806.73 for economic losses, emotional distress, punitive damages, and attorneys' fees and costs.

1

## II. BACKGROUND

A.      <u>Facts Alleged in the Complaint</u>

Plaintiffs allege that Lodge, a professional rugby player in Australia with a "history of violence and animosity towards women," threatened their persons and property while "clearly intoxicated" on October 16, 2015, at approximately 4:00 a.m. (Compl. at 1, 5, 7). Plaintiff Carolin Dekeyser ("Dekeyser") and her friend were taking a taxi to Guillaume Roemaet's ("Roemaet") apartment, where they were staying while visiting New York. (*Id.* at 1). Once they arrived outside of the building, Lodge belligerently approached their taxi. (*Id.* at 1, 4). The taxi driver refused to give Lodge a ride, at which point Lodge turned his attention to Dekeyser and her friend. (*Id.* at 1). As they attempted to hurry inside of the apartment building, Lodge followed, yelling he wanted to take them to Australia and "violently grabb[ed] [Dekeyser] by the shoulders ... so that she could not escape." (*Id.* at 1-2, 5).

Dekeyser and her friend feared for their safety given that Lodge is an "enormous man standing 6'4" and well over 200 pounds." (*Id.* at 2). They ran into the foyer of Roemaet's apartment building and frantically rang buzzers to gain entry. (*Id.* at 6). Lodge followed and threatened Dekeyser, stating "Do you think you're going to die? This is the night you're going to die." *Id.* Plaintiff Joseph Cartright ("Cartright"), a resident of the building for more than twenty years, heard the buzzer and exited his apartment. *Id.* Cartright recognized Dekeyser, opened the door to the building's main area, and asked if she and her friend were "ok." (*Id.* at 2, 7).

At that point, Lodge turned his attention to Cartright as the women ran to Roemaet's apartment for help. (*Id.* at 2). Cartright pleaded with Lodge to leave. (*Id.* at 8). Lodge grabbed Cartright and made death threats. (*Id.* at 8). Roemaet came into the lobby area, and when Lodge

2

saw Roemaet's tattoos, Lodge threatened to kill him. (*Id.* at 8). Roemaet, Dekeyser, and her friend went back into Roemaet's apartment. *Id.*

Next, Lodge went into Cartright's apartment, where he found Cartright's wife, Plaintiff Ruth Fowler ("Fowler"), and their nine-year-old son. (*Id.* at 2, 8-9). Cartright yelled to Fowler to call the police. (*Id.* at 9). Lodge repeatedly shouted, "My name is Matthew Lodge. I come in peace. Salaam [sic] Alaikum." *Id.* He also repeated that his lawyer "will take care of all of this, do not worry." (*Id.* at 9). He entered the master bedroom, where Fowler was sitting on top of the bed. *Id.* Lodge attempted to open the closet in the bedroom and then went back into the living room area. *Id.* Cartright was able to cajole Lodge out of the apartment. *Id.* Once Lodge exited, Cartright followed, and Fowler closed the door behind them. *Id.*

Once outside the apartment, Lodge put Cartright in a headlock, punched him several times in the head, and shoved him. (*Id.* at 2, 10). Lodge then re-entered Cartright's apartment and blocked the entrance with furniture. (*Id.* at 10). Fowler grabbed her son, who had been awakened by the noise, and hid in the bathroom near the master bedroom. *Id.* Fowler heard Lodge in the kitchen breaking plates, glass, and living room furniture. (*Id.* at 10, 11). Lodge then approached the bathroom in which Fowler and her son were, attempted to gain entry, and punched the door, leaving a hole. (*Id.* at 10). Fowler instructed her son to hide in the bathtub. *Id.* Lodge went into the kitchen and living room again and continued to break items. (*Id.* at 11).

While this was going on inside the apartment, Cartright ran outside of the building in an attempt to flag down police, some of whom were responding to multiple 911 calls about the incident. *Id.* The officers entered the building's main area and Lodge hurled a bottle of wine in their direction from inside the apartment. *Id.* At that point, the officers, with their guns drawn,

entered the apartment and found Lodge in the bedroom closet. (*Id.* at 2, 12). The officers handcuffed Lodge and removed him from the apartment. (*Id.* at 12).

B.  Procedural Background

Plaintiffs filed their Complaint on December 21, 2015, alleging battery, assault, intentional infliction of emotional distress, false imprisonment, gender-motivated violence, conversion, and trespass to chattels. (*Id.* at 12-17). For their intentional infliction of emotion distress claim, Plaintiffs allege that they are entitled to compensatory and punitive damages. (Compl. at 13-14). For their claim under New York City's Gender-Motivated Violence Act ("GMVA"), New York City Administrative Code § 8-901, Plaintiffs allege they are entitled to compensatory and punitive damages, in addition to attorneys' fees and costs. (*Id.* at 15). Plaintiffs also allege that they are entitled to monetary damages for their conversion and trespass to chattels claims. (*Id.* at 15-16).

Plaintiffs' counsel arranged to serve the Complaint in this civil matter through Defendant's defense counsel in a criminal case, Thomas C. Rotko. (Doc. No. 23-3, Ex. C at 2). Service was effectuated on December 21, 2015. (Doc. No. 9, Aff. of Service). Lodge failed to appear, move, answer, or otherwise respond to the Complaint, and Plaintiffs asked the Clerk of Court to enter default against him. (Doc. Nos. 13, 14). The Clerk issued a Certificate of Default on March 1, 2016. (Doc. No. 15). On March 24, Plaintiffs filed their Motion for Default Judgment. (Doc. Nos. 16, 17). The Court referred this case to Magistrate Judge Ellis for an inquest on liability and damages on April 18, 2016. (Doc. No. 18). On April 21, 2016, Plaintiffs were ordered to submit a memorandum on the method of service and damages sought. (Doc. No. 19). The memorandum was received on May 6, 2016. (Doc. Nos. 22, 23). A hearing was held on July 7, 2016. (Doc. No. 27). Plaintiffs filed their post-hearing submissions on August 22, 23, and 26, 2016. (Doc. Nos. 32-35, 37-39). Lodge made no submission.

C.   Plaintiffs' Evidence in Support of Damages

   *1. Inquest Hearing Testimony*

Cartright and Fowler testified at the inquest hearing, but Dekeyser did not. They reiterated some of the allegations in the Complaint, adding that on the night of the incident, their son stated "I'm too young to die," and their impression that Lodge was "suffering from PTSD or something." (Doc. No. 40 ("Hr'g Tr.") at 8, 14, 19). Their testimony largely involved the incident's effect on their son. Within two weeks, the family went to one therapy session. Cartright and Fowler went to a session prior to their son seeing a child therapist. (*Id.* at 19-20). For approximately three weeks, their son did not sleep in his own bed, had night terrors, and was scared when the doorbell rang. (*Id.* at 18-19). During this same time period, they worried they would run into Lodge, who was staying at a hotel one and a half blocks away, and avoided media attention by being "hermits." (*Id.* at 21). Four months later, the family moved to Brooklyn because they "couldn't live in that apartment anymore." (*Id.* at 24, 31).

In addition to the emotional impact of the incident, they incurred various economic expenses. These costs include moving expenses, a 15-20% rent increase, rental of a studio space, replacement of furniture and kitchenware, and a $1,500 retainer for a criminal attorney they hired to protect their interests as crime victims. (*Id.* at 22, 24-26). Cartright did not quantify any loss of income nor any medical bills, although he did suffer a swollen head, cut on the ear, and aches and pains that "come[] and go[]." (*Id.* at 20, 27-28). Fowler testified that she did not experience any impact professionally, though she did take anxiety medication after the event. (*Id.* at 31, 33). Cartright and Fowler testified that they intend to continue therapy. (*Id.* at 20). Photographs of damage to their personal items were filed with the Court.

*2. Post-Hearing Submission*

Plaintiffs filed a post-hearing memorandum, supplemental documentary evidence, and affidavits. (Doc. Nos. 32-35, 37-39). The affidavits from Plaintiffs Cartright and Fowler restate facts within the Complaint and facts to which they testified at the hearing. (Doc. Nos. 34, 35). Dekeyser's declaration details the emotional impact the incident had on her. (Doc. No. 39). She indicated that she is "haunted by the fear that Lodge might somehow seek [her] out," "suffers from trouble sleeping, night terrors, nervousness, and anxiety whenever [she] is in the dark," and has a "disturbing feeling that someone is following [her] all the time." (*Id.* at 6). Dekeyser stated that she has been prescribed sleeping and anti-anxiety medication and has paid between €200 and €300 out-of-pocket for ten therapy sessions, which she intends to continue. *Id.*

Plaintiffs seek a total of $1,238,206.73 in damages, and $99,537.23 in attorneys' fees and costs. (Doc. No. 33 ("Decl. of Renan F. Varghese") at 5).

| Plaintiff | Category of Damages | Amount |
|---|---|---|
| Cartright/Fowler | Economic Loss | $63,206.73 |
| Cartright | Past Pain and Suffering | $250,000 |
|  | Future Pain and Suffering | $125,000 |
|  | Punitive | $150,000 |
| Fowler | Past Pain and Suffering | $150,000 |
|  | Future Pain and Suffering | $125,000 |
|  | Punitive | $125,000 |
| Dekeyser | Economic Loss | TBD |
|  | Past Pain and Suffering | $100,000 |
|  | Future Pain and Suffering | $50,000 |
|  | Punitive | $100,000 |
| Cartright/Fowler/Dekeyser | Attorneys' Fees and Costs | $99,537.23 |
| **TOTAL** | | **1,337,743.96** |

Economic damages for Cartright and Fowler are broken down as follows (Doc. No. 38 ("Pl.'s Mem. of Law") at 10-11):

| Item | Value | Evidence |
|---|---|---|
| Security Deposit for New Apartment | $10,500 | Exhibit 22 |
| Increase in Rent for New Apartment (12 months) | $7,500[1] | Exhibit 16 at 37:19-21 |
| Real Estate Broker's Fee | $4,200 | Exhibit 22 |
| Movers | $200 | Exhibit 16 at 37:12-14 |
| Security Deposit for New Apartment (projected) | $10,500 | N/A |
| Increase in Rent for New Apartment (projected) | $7,500 | N/A |
| ~~Real Estate Broker's Fee (projected)~~ | ~~$4,200~~ | ~~N/A~~ |
| ~~Movers (projected)~~ | ~~$200~~ | ~~N/A~~[2] |
| Criminal Attorney | $1,500 | Exhibit 25 |
| Sofa | $2,298 | Exhibit 2 |
| Sideboard | $1,268 | Exhibit 2 |
| Coffee table | $4,000 | Ex. 16 38:9-11 |
| Bed for Son | $880.73 | N/A |
| Mental Health Professional (two visits) | $400 | Exhibit 1 |
| Dinnerware (approximation) | $300 | N/A |
| Lamp (approximation) | $80 | N/A |
| Long Island City studio ($640/month) | $7,680 | N/A |
| **TOTAL** | **$63,206.73** | |

Economic damages for Dekeyser list the cost for a hotel room in New York after the incident (approximated at $1,000), therapist visits, sleeping pills, and anti-anxiety medication. (Pl.'s Mem. of Law at 11). None of these amounts is supported by documentary evidence. *Id.*

---

[1] Cartright testified at the inquest hearing that his rent increased by $600 per month, which equals $7,200 per year. The Court will use $7,200 as the proper calculation when making the recommendation below.

[2] Based on Plaintiffs' submissions, the Court finds projected moving expenses and a projected broker's fee duplicative of actual moving expenses and an actual broker's fee already listed in Plaintiffs' economic loss table. It thus declines to factor these costs into its final economic damages calculation. If Plaintiffs wish to submit evidence showing that they incurred these two costs twice, they are given leave to do so.

7

## III. DISCUSSION

A.     Jurisdiction and Venue

This Court has subject matter jurisdiction over claims in this action pursuant to 28 U.S.C. §§ 1332 (diversity jurisdiction). The Defendant is domiciled in Australia, the Plaintiffs are domiciled in New York state and Germany. (Compl. at 3). The damages sought are in excess of $75,000. Venue is proper in this court pursuant to 28 U.S.C. § 1391(b).

B.     Default Judgment and Inquest Standard

The Clerk of Court must enter default against a defendant who has failed to plead or otherwise defend an action, and that failure is shown by affidavit or otherwise. Fed. R. Civ. P. 55(a). A court may enter a judgment of default pursuant to Rule 55 (b)(2) of the Federal Rules of Civil Procedure. In order to do so, an application must be presented to the court for the entry of judgment, and notice of the application must be sent to any defaulting party who has appeared to allow the party to show cause to the court why a default should not be entered. In determining whether to enter a judgment of default, a court may consider numerous factors, including the following: "whether plaintiff has been substantially prejudiced by the delay involved[] and whether the grounds for default are clearly established or in doubt." 10A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure, § 2685 at 32 (1998).

Following a default judgment, all well-pled factual allegations of the complaint, except those relating to damages, are accepted as true. *Cotton v. Slone,* 4 F.3d 176, 181 (2d Cir. 1993). A factual allegation will be deemed not well-pled only in "very narrow, exceptional circumstances." *Trans World Airlines, Inc. v. Hughes,* 308 F. Supp. 679, 683 (S.D.N.Y. 1969) (Metzner, J.), *modified,* 449 F.2d 51 (2d Cir. 1971), *rev'd on other grounds,* 409 U.S. 363 (1973).

At an inquest on damages, the plaintiff bears the burden of establishing an amount of damages with reasonable certainty. *RGI Brands LLC v. Cognac Brisset-Aurige, S.A.R.L.*, 2013 WL 1668206 (S.D.N.Y. Apr. 18, 2013) (Schofield, J.), *report and recommendation adopted*, 2013 WL 4505255 (S.D.N.Y. Aug. 23, 2013) (Peck, M.J.). A court may make a determination on damages without a hearing "as long as it [has] ensured that there is a basis for the damages specified in the default judgment." *TMS Entm't Ltd. v. Madison Green Entm't Sales, Inc.*, 2005 WL 2063786, at *2 (S.D.N.Y. Aug. 16, 2005) (Ellis, M.J.) (citing *Transatl. Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir.1997)). Accordingly, a court may rely on plaintiff's affidavits and documentary evidence in determining the reasonableness of the damages requested. *Id.* (citing *Tamarin v. Adam Caterers, Inc.*, 13 F.3d 51, 54 (2d Cir. 1993)).

C. Liability

Here, the grounds for default judgment are clearly established. Lodge has failed to answer the Complaint filed by Plaintiffs over one year ago, and the elements of each cause of action are supported by facts alleged within the Complaint. The Court therefore grants Plaintiffs' Motion for Default Judgment.

D. Damages

Awarding damages is not an exact science. Plaintiffs have the burden "to establish damages and provide some reasonable basis to quantify them." *Cappetta v. Lippman*, 913 F. Supp. 302, 305 (S.D.N.Y. 1996) (Batts, J.). "If a plaintiff fails to demonstrate its damages to a reasonable certainty, then the court should decline to award any damages, even where liability has been established through default." *Belizaire v. Rav Investigative & Sec. Servs.*, 61 F. Supp. 3d 336, 345 (S.D.N.Y. 2014) (Batts, J.). "Where a defaulting defendant has not made any submission on a damages inquest, the court must assess whether the plaintiff has provided a sufficient basis to

determine damages … and may determine the adequacy of the plaintiff's damages claim based on the plaintiff's submitted proofs." *Belizaire*, 61 F. Supp. 3d at 345. (citations omitted)

Pursuant to Federal Rule of Civil Procedure 54(c), "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c). Although Plaintiffs' Complaint did not state the amount of damages sought, the categories of damages are stated within the Complaint—declaratory judgment, injunctive relief, compensatory damages, punitive damages, and attorneys' fees and costs. (Compl. at 16-17).

1. *Economic Damages*

At the inquest hearing, Cartright and Fowler testified extensively about the economic damages incurred. (Hr'g Tr. at 37-45). Cartright and Fowler also itemized their economic damages in a post-hearing submission. (Pl.'s Mem. of Law at 10-11). Some of the damages are supported by documentary evidence, such as the real estate broker's fee, security deposit, retainer for a criminal attorney, sofa, sideboard, and therapy sessions. *Id.* Others are approximated or entered into the record, such as moving expenses, dinnerware, lamp, coffee table, and their son's bed. *Id.*

Of the items listed, the Court finds that Cartright and Fowler adequately submitted evidence of, or reasonably approximated, both economic expenses already incurred and those to be incurred in the future. The Court awards $58,806.73 in economic damages for Cartright and Fowler, for all economic losses claimed, minus projected moving expenses and a projected real estate broker's fee. Plaintiff Dekeyser claims $1,000 in economic damages resulting from a hotel stay in the days following the incident. (Pl.'s Mem. of Law at 11). The rest of the economic damages she incurred were "TBD" at the time of her post-hearing submission. *Id.* No subsequent

filing clarified the extent of Dekeyser's actual or projected economic damages. I thus award Dekeyser economic damages totaling $1,000.

Plaintiffs also seek pre-judgment interest in their Complaint for compensatory damages. (Compl. at 16); *see First Nat'l Bank v. American Foam Rubber Corp.*, 309 F. Supp. 545, 546 (S.D.N.Y. 1969) (Cooper, J.) (holding "[p]re-verdict interest has long been recoverable as a matter of right in New York in actions to recover for property damage stemming from intentional torts."). Prejudgment interest is assessed at a rate of nine percent per year, N.Y.C.P.L.R. § 5004, and it is within the Court's discretion to decide the date interest accrues. *Alvarez v. 215 N. Ave. Corp.*, 2015 WL 3855285, at *3 (S.D.N.Y. June 19, 2015) (Roman, J) (quoting *Conway v. Icahn & Co.*, 16 F.3d 504, 512 (2d Cir. 1994)).

I grant Plaintiffs a prejudgment interest computed at an annual rate of nine percent on the principal amount of $59,806.73, calculated by the Clerk of Court from October 28, 2015, the date of the first therapy session, to the date of entry of final judgment.

2. *Emotional Distress Damages*

Plaintiffs seek the following pain and suffering damages, totaling $800,000 (Decl. of Renan F. Varghese at 5):

(1) past pain and suffering, $250,000, and future pain and suffering, $125,000, for Cartright;

(2) past pain and suffering, $150,000, and future pain and suffering, $125,000, for Fowler; and

(3) past pain and suffering, $100,000, and future pain and suffering, $50,000, for Dekeyser.

The pain and suffering damages sought by Cartright and Fowler are supported by hearing testimony, affidavits, and therapy invoices. During the inquest hearing, Cartright testified that

11

Lodge's attack on him resulted in in a swollen head, cut on his ear, and aches and pains that "come[] and go[]." (Hr'g Tr. at 20). He also feared for the safety of his own life, as well as the lives of his wife and nine-year-old son. (*Id*. at 17-18). Prior to police entering his home to apprehend Lodge, Cartright pleaded to them to "not shoot [Lodge] in front of [his] kid." (Doc. No. 34 ("Cartright Aff.") at 4). After the altercation, which lasted approximately forty-five minutes, his creativity as an artist was diminished. (Hr'g Tr. at 24-25). Cartright expressed that this type of incident was "an utter violation of [his] sense of being." (*Id*. at 20-21). In his post-hearing affidavit, Cartright stated that he has "become more concerned for the welfare of [his] family on a day-to-day basis … and anxious and concerned that someone might harm [] them." (Cartright Aff. at 5).

Fowler testified that the incident was "terrifying at the time" as she frantically called 911, witnessed Lodge assault her husband, and attempted to protect her son while locked in a bathroom. (Hr'g Tr. at 28-29, 31; Doc. No. 35 (Fowler Aff.) at 2). Although she did not see police officers enter the apartment with guns drawn and has not been impacted professionally, she was prescribed anxiety medication and recalled being told by her son, "I'm just a kid. I don't want to die." (Hr'g Tr. at 31, 32, 34; Fowler Aff. At 3). The couple remained too afraid to leave their apartment for over a month after the incident. (Hr'g Tr. at 21). Their son experienced night terrors and the family moved from Manhattan to Brooklyn because they were not "comfortable" in the apartment anymore. (Hr'g Tr. at 18). Fortunately, their son did not change schools as a result. (*Id*. at 33). Fowler stated in her post-hearing Affidavit that she has "been consumed by anxiety since the attack, but [has] to remain strong and focus [on their son's] wellbeing." (Fowler Aff. at 4).

Dekeyser was not present at the inquest hearing. In her post-hearing declaration, she stated that she was "haunted by the fear that Lodge might somehow seek [her] out and harm [her]" even

though she has returned to Germany. (Doc. No. 39 at 6.) She "suffer[s] from trouble sleeping, night terrors, nervousness, and anxiety whenever [she] is in the dark." *Id.* Dekeyser has been "prescribed [] sleeping pills and anti-anxiety medication," and has attended several therapy sessions that she plans to continue. *Id.* She worries she "will never feel safe again" and has "a disturbing feeling that someone is following [her] all the time, which has resulted in massive detrimental effects upon [her] life." *Id.* Dekeyser has not quantified these damages for the Court's consideration. She has submitted no documentary evidence supporting her testimony.

When determining the appropriate amount of damages, courts look to comparable cases. *Jordonne v. Ole Bar & Grill, Inc.*, 2016 WL 3409088, at *8 (McCarthy, J.) (S.D.N.Y. Apr. 26, 2016) (citing *Norica v. Dieber's Castle Tavern, Ltd.*, 980 F. Supp. 2d 492, 505 (Karas, J.) (S.D.N.Y. 2013)). Cartright was physically assaulted, experiences pain that "comes and goes," and is continuously worried about the wellbeing of his family, which impacts him professionally. (Hr'g Tr. at 20; Cartright Aff. at 5). Fowler was prescribed anxiety medication and the family went to therapy, which they plan to continue. (Hr'g Tr. at 31). The pain and suffering Cartright and Fowler experienced, and continue to experience, is severe. It is compounded by their move from their home of twenty years and the emotional toll of consoling their terrorized nine-year-old son. (Cartright Aff. at 5; Fowler Aff. at 4). The incident itself was short-lived, but the impact on their family continues. These circumstances warrant a substantial award. *See Stampf v. Long Island R.R. Auth.*, 2011 WL 3235704, at *35-37 (E.D.N.Y July 28, 2011) (Gold, M.J.) (citing various cases where testimonial evidence was sufficient in supporting the severity of injuries resulting in emotional distress awards in excess of $100,000).

Dekeyser alleges that she has undergone several therapy sessions and worries that her fear and anxiety will persist. (Dekeyser Decl. at 6). Although her declaration details the emotional

impact of the incident, her experience has not disrupted her life in the way that it has for Cartright and Fowler. Nonetheless, the Court finds her testimonial evidence sufficient to warrant an award of emotional damages.

Based on the evidence presented here and review of similar cases, the Court awards emotional damages in the amount of $375,000 for Cartright, $275,000 for Fowler, and $150,000 for Dekeyser.

### 3. *Punitive Damages*

Plaintiffs seek a total of $375,000 in punitive damages. (Decl. of Renan F. Varghese at 5). "Punitive damages are recoverable in all actions based upon tortious acts which involve ingredients of malice, fraud, oppression, insult, wanton or reckless disregard of one's rights, or other circumstances of aggravation, as a punishment of the defendant and admonition to others." *O'Neill v. Yield House Inc.,* 892 F. Supp. 76, 78 (S.D.N.Y. 1995) (Parker, J.). Because Lodge acted with "wanton or reckless disregard" for Plaintiffs' rights, the Court finds that punitive damages are warranted.

Punitive damages are meant to deter future behavior, but are limited to an amount necessary to reach that aim. *See Caravantes v. 53rd St. Partners, LLC*, 2012 WL 3631276, at *25 (Aug. 23, 2012). Given the facts of this case, and supporting evidence submitted by Plaintiffs indicating Lodge's history of violence, the Court awards punitive damages in the amount of $150,000 for Cartright, $125,000 for Fowler, and $100,000 for Dekeyser.

### 4. *Attorneys' Fees and Costs*

Under New York law, a plaintiff who prevails in an action under the GMVA is entitled to recover reasonable attorneys' fees and costs. *See* N.Y.C. Admin. Code § 8-904 Plaintiffs' counsel submitted a request for attorneys' fees and costs totaling $99,537.53, pursuant to their gender-

14

motivated violence cause of action. (Pl.'s Mem. of Law at 22-31; Decl. of Renan F. Varhese, Ex. 26-27).

In determining the appropriate amount of attorneys' fees to award, the Court must calculate a presumptively reasonable total by multiplying a reasonable hourly rate by the reasonable number of hours worked in pursuing Plaintiffs' GMVA-related claim. *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 493 F.3d 110, 117-18 (2d Cir. 2007), *amended on other grounds*, 522 F.3d 182 (2d Cir. 2008). The factors relevant to this determination include: "(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *Arbor Hill*, 493 F.3d at 114 (internal quotation marks omitted).

The reasonable hourly rate is the rate "a paying client would be willing to pay. In determining what rate a paying client would be willing to pay, the district court should … bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively. *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany & Albany Cty. Bd. of Elections*, 522 F.3d 182, 190 (2d Cir. 2008). In determining whether the hours claimed by counsel were "reasonably expended," the Court must evaluate "whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Hensley*, 461 U.S. at 433.

In the Second Circuit, a party seeking an award of attorneys' fees must support its application by submitting time records that detail "for each attorney, the date, hours expended, and the nature of the work done." *N.Y. State Assoc. for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1154 (2d Cir. 1983). The burden is on the party seeking attorneys' fees to submit sufficient evidence to support the hours worked and the rates claimed. *See Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984). The Court should not consider excessively high rates or hours that were not reasonably expended. "Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983).

If the court determines that the number of hours expended is excessive, redundant, or otherwise unnecessary, the court may make reductions to individual entries or elect to account for such over-billing in an across-the-board percentage deduction. *Luciano v. Olsten Corp.*, 109 F.3d 111, (2d Cir. 1997). In calculating the number of reasonable hours, the court looks to "its own familiarity with the case and its experience with the case as well as to the evidentiary submissions and arguments of the parties." *Clarke v. Frank*, 960 F.2d 1146, 1153 (2d Cir. 1992).

The hourly rates Plaintiffs' counsel requests—$700 for partners, $300-500 for associates, and $180 for paralegals (Pl.'s Mem. of Law at 25)—are within the range approved and awarded in this District, and in this Circuit. (*See Id.* at 26-27 (citing various decisions where comparable rates were approved in lodestar calculations)). Plaintiffs' counsel requests an award of fees based on a total of 252.7 hours of attorney and paralegal time litigating this case until default judgment and an inquest on damages were requested: 33.5 partner hours, 64.8 senior associate hours, 121

associate hours, and 33.4 paralegal hours, totaling $98,162.00. Expenses amount to $1,375.23, including the case filing fee, copying and printing, meals and transportation, postage, PACER, records, and Westlaw legal research. (Decl. of Renan F. Varhese, Ex. 27 at 2-3).

A few factors counsel in favor of reducing the attorneys' fees award by Plaintiffs. First, review of counsel's contemporaneous billing records indicates that some of the hours Plaintiffs' counsel expended were excessive. This case is a straightforward tort action requiring only a few substantive filings, many of which recycled exhibits and arguments. (*See* Doc. Nos. 16, 17, 22, 23, 32-35, 38-39). The billing records show duplicative and unnecessary internal conferences, communications with the media, and general research. (Decl. of Renan F. Varhese, Ex. 26). An expenditure of $98,162 in attorneys' fees to reach default judgment in a case where Defendant did not appear is unnecessary.

Second, Plaintiffs seek attorney's fees only in connection with their gender-motivated violence claim. Plaintiffs present little evidence to support a violation of the GMVA. The relevant evidence submitted amounts to a comment made by Lodge to Dekesyer as she exited the taxi -- namely, that he asked Dekeyser and her friend to "come to Australia" (Compl. at 5)— as well as an unrelated 2015 charge of intimidation of a woman in Australia. (Compl. at 4-5). Gender-motivated violence was not discussed at the inquest hearing, where Dekeyser was not present, nor were facts that give rise to a gender-motivated violence claim highlighted within Plaintiffs' submissions in support of their Motion for Default Judgment.

The lion's share of legal work in this matter was expended in litigating a relatively straightforward tort action that was not characterized by Plaintiffs as gender-related. Plaintiffs' counsel should not recover the entirety of attorneys' fees expended when they are entitled to attorneys' fees only for work done in connection with Plaintiffs' GMVA claim.

Given these determinations, find that $10,000 in attorneys' fees is fair and reasonable, and I award that amount to Plaintiffs.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiffs' Motion for Default Judgment, and enters a judgment in the amount of $1,234,806.73, allocated and summarized as follows:

(1) All Plaintiffs: $59,806.73 in economic damages, plus prejudgment interest;

(2) Cartright: $525,000 in emotional distress and punitive damages;

(3) Fowler: $400,000 in emotional distress and punitive damages;

(4) Dekeyser: $250,000 in emotional distress and punitive damages; and

(5) Attorneys' fees and costs: $10,000.

This Opinion and Order resolves docket entries 16 and 32. The clerk of court is directed to close this case. All pending motions are moot.

SO ORDERED.

Dated: March 30, 2017

New York, New York

_____
THE HON. KIMBA M. WOOD
United States District Judge